USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 9/19/2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

G.S. and A.S., *individually and on behalf of* K.S.,

Plaintiffs,

v.

NEW YORK CITY DEPARTMENT OF EDUCATION,

Defendant.

No. 15-CV-5187 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiffs G.S. and A.S., (the "Parents") individually and on behalf of their minor child K.S. (the "Student"), bring this action against Defendant the New York City Department of Education (the "DOE") under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq*. After concluding that the DOE's proposed education plan and school placement would not provide their daughter, a child with autism, with a free appropriate public education ("FAPE"), the Parents placed her in the Rebecca School, a private school for children with disabilities, for the 2012–2013 academic year. On July 2, 2012, the Parents filed a due process complaint seeking tuition reimbursement. On March 6, 2013, an Impartial Hearing Officer ("IHO") issued a decision granting the Parents' request for reimbursement. On March 5, 2015, a State Review Officer ("SRO") reversed the IHO's decision. The Parents filed this action on July 2, 2015. Both parties now move for summary judgment. For the following reasons, the DOE's motion for summary judgment is granted, and the Parents' motion is denied.

## LEGAL STANDARD

"The IDEA requires 'a state receiving federal funds under the IDEA to provide disabled children with a FAPE.'" *L.O. v. N.Y.C. Dep't of Educ.*, 822 F.3d 95, 102 (2d Cir. 2016) (alterations omitted) (quoting *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 174–75 (2d Cir. 2012)). "In order to ensure that disabled children receive a free appropriate public education, school districts must create individual education programs ('IEP') for such children." *C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 72 (2d Cir. 2014). An IEP "is 'a written statement that sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *R.E.,* 694 F.3d at 175 (quoting *D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ.*, 465 F.3d 503, 507–08 (2d Cir. 2006)).

In New York, Committees on Special Education ("CSEs") convened by the local school district are responsible for developing IEPs. N.Y. Educ. Law § 4402(1)(b)(1). "In developing a particular child's IEP, a CSE is required to consider four factors: (1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial behavior and needs." *Gagliardo v. Arlington Central Sch. Dist.*, 489 F.3d 105, 107–08 (2d Cir. 2007) (citing N.Y. Comp. Codes R. & Regs. tit. 8 § 200.1(ww)(3)(i) (hereinafter "NYCRR")). The CSE must also "ensure that the parents of each child with a disability are members of any group that makes decisions on the educational placement of their child." 20 U.S.C. § 1414(e); *see also* 34 C.F.R. § 300.501(c)(1).

"If a state fails in its obligation to provide a free appropriate public education to a handicapped child, the parents may enroll the child in a private school and seek retroactive reimbursement for the cost of the private school from the state." *Frank G. v. Bd. of Educ. of Hyde*

*Park*, 459 F.3d 356, 363 (2d Cir. 2006). "The Supreme Court has established the three-pronged *Burlington/Carter* Test to determine eligibility for reimbursement, which looks to (1) whether the school district's proposed plan will provide the child with a free appropriate public education; (2) whether the parents' private placement is appropriate to the child's needs; and (3) a consideration of the equities." *C.F.*, 746 F.3d at 73. "Under New York's Education Law § 4404(1)(c), the local school board bears the initial burden of establishing the validity of its plan at a due process hearing." *M.O. v. N.Y.C. Dep't of Educ.*, 793 F.3d 236, 243 (2d Cir. 2015) (quoting *R.E.*, 694 F.3d at 184). "If the board fails to carry [its burden of establishing the validity of an IEP], the parents bear the burden of establishing the appropriateness of their private placement and that the equities favor them." *Id.*

If a disabled student's parents believe that an IEP does not comply with the IDEA, they may file a due process complaint with the appropriate state agency. 20 U.S.C. § 1415(b)(6). Parents may then challenge their child's IEP in an "impartial due process hearing," 20 U.S.C. § 1415(f), before an IHO appointed by the local board of education. *See* N.Y. Educ. Law § 4404(1). Either the DOE or the student's parents may subsequently challenge the IHO's decision to the Office of State Review where it will be reviewed by an SRO. *See id.* § 4404(2); *see also* 20 U.S.C. § 1415(g). Finally, the SRO's decision may be challenged in state or federal court. 20 U.S.C. § 1415(i)(2)(A).

## BACKGROUND

### I. Factual Background

#### A. The May 2012 CSE and IEP

On May 24, 2012, the local school district in which the Parents live (the "District") convened a CSE to develop an IEP for K.S., a child with autism who was then nine years old and

had been attending the Rebecca School every year since she was five. *See* Jan. 23 Tr. 507. The CSE consisted of (i) Dr. Craig Czarnecki, a school psychologist and the District representative; (ii) the Parents; (iii) Ms. Dakin, a special education teacher; (iv) Ms. Gufarotti, K.S.'s then-current teacher at the Rebecca School; (v) Mr. Noble, the Student's Rebecca School social worker; and (vi) a parent representative from the community. *See* May IEP at 16.

To create K.S.'s IEP, the CSE reviewed K.S.'s Rebecca School progress report from December 2011, DOE Ex. 5 (the "Progress Report"), her psychoeducational evaluation conducted on December 28, 2011, DOE Ex. 4 (the "Psychoeducational Evaluation"), and Dr. Czarnecki's January 30, 2012 classroom observation, DOE Ex. 3 (the "Classroom Observation"). *See* Nov. 8 Tr. 129, 138.[1] As reflected in the meeting minutes taken by Dr. Czarnecki, *see* DOE Ex. 9 (the "CSE Minutes"), the CSE spent "a large amount of time" going through the Rebecca School Progress Report and reviewed its goals "line by line" with the Student's Rebecca School teacher, Nov. 18 Tr. 138-14; Jan. 23 Tr. 562. They "reviewed the goals that [K.S.] was working on in school at that time, and had a discussion about what goals would be appropriate for her to continue to work on . . . in the future." *Id.* at 152–53.

Based on these discussions, the CSE developed an IEP for the 2012–2013 school year. *See* DOE Ex. 6 (hereinafter the "May IEP" or "IEP"). The CSE first determined, and the IEP reflected, that K.S. was "has very limited skills in academics as well as daily living and socialization[,] . . . has very short attention span with hyperactivity and constant echolalia and perseveration[,] . . . has very limited self-awareness and ability to interact with others[,] . . . [and] is currently functioning below the kindergarten level in all areas except reading decoding." May IEP at 1; Nov. 8 Tr. 183–85. It thus recommended a classroom with six students, one teacher, and one aide, known as a

[1] Citations to the IHO hearing transcript are identified by the date of the testimony (July 16, September 20, November 8, November 19, January 14, or January 23) and page number thereof.

6:1:1 class, for a twelve month school year, *see* Nov. 8 Tr. 155–57, and a one to one (or 1:1) crisis management paraprofessional assigned solely to K.S. because, according to the IEP, K.S. "likes to climb" and "is not aware of safety issues," May IEP at 2. The IEP also recommended the following related services: (1) speech and language therapy for thirty minutes individually four times per week, and thirty minutes in a group one time per week; (2) physical therapy ("PT") for thirty minutes individually two times per week; (3) occupational therapy ("OT") for thirty minutes individually four times per week and thirty minutes in a group one time per week; and (4) counseling services for thirty minutes individually one time per week. *See* May IEP at 9–10; *see also* Nov. 8 Tr. 157–58. Although the IEP did not call for music therapy—a related service in which K.S. was enrolled at the Rebecca School—it directed that music be integrated "throughout the school day," and noted that K.S. "really enjoys sound," that "[m]usic engages [her] across a variety of environments," and that music "helps to regulate [her] and to express herself." May IEP at 1.

**B. The Placement and the Due Process Complaint**

On June 7, 2012, the DOE offered K.S. a placement for the 2012–2013 schoolyear at P.S. 75 in Queens, New York ("the Placement School" or "School"). *See* DOE Ex. 10. On June 15, 2012, the Parents visited the Placement School with K.S.'s then-current Rebecca School teacher. *See* Jan 23 Tr. 525. There, they met a Placement School guidance counselor, Mr. Rose, and received a tour during which they saw several classrooms, the related services room containing sensory equipment, and various other school facilities. *See* Jan 23 Tr. 525–26; *see also* Pls.' Mem. at 5.

K.S.'s parent, A.S., would later testify that Mr. Rose stated that although the Placement School would "try to" provide the services called for in the IEP outside of the classroom—as the

IEP requires—the school "like[s] to have the children assigned to classrooms as much as possible" in light of space constraints. Jan. 23 Tr. 532. A.S. further testified that she learned that, when students would leave the classroom for related services, the instructors would "just pick a room, whatever is available." *Id.* at 531. A.S. also relayed that she observed no sensory equipment in the classrooms and only limited sensory equipment in the related services room. *See id.* at 529–30.

Following their visit, the Parents determined that the Placement School was not appropriate for K.S. and they filed a due process complaint against the DOE on July 2, 2012 requesting an impartial hearing and seeking "[t]uition reimbursement for unilateral placement at the Rebecca School for the 2012–2013 school year." IHO Ex. A.[2]

**C. The Administrative Hearing and Decision**

Starting July 16, 2012, and continuing for seven non-consecutive days ending January 23, 2013, IHO Israel Wahrman held an impartial hearing on the Parents' claim for reimbursement. *See* IHO Op. at 1, 4. He heard testimony from (i) A.S., K.S.'s parent; (ii) Dr. Czarnecki; (iii) Tina McCout, the Director of the Rebecca School; (iv) Kenji Takeda, the Rebecca School music therapist working with K.S.; (v) Leslie Grubler, a speech therapist hired by the Parents to work with K.S.; (vi) Amanda Friedman, an education consultant who runs a program attended by K.S.; and (vii) Natalie Brandefine, K.S.'s Rebecca School teacher at the time of the hearing. *See id.* at 1–2. A.S. and Dr. Czarnecki were the only witnesses who had attended the CSE.

On March 6, 2013, the IHO released his decision. In an eight page written opinion, the IHO stated that while "there do not appear to have been any procedural inadequacies that would

---

[2] After filing the due process complaint, the Parents visited the school again, but did not alter their view about its appropriateness for K.S. *See* Jan 23 Tr. 540–41.

rise to the level of denial of FAPE," the IEP was substantively inadequate, and the proposed Placement School was inappropriate. *Id.* at 9. He reasoned that

> there are serious questions raised by the parents with regard to whether an IEP with goals that appear to be lifted from Rebecca School goals, and an IEP that appears somewhat out of date and to make significant changes [*sic*], such as substituting counseling for music therapy for a student whose communication appears to be primarily through music, is in fact an appropriate IEP. Further, it is uncontested that the IEP did not provide counseling and training for the parents of this child with autism. And the parents . . . raised serious questions with regard to whether the public school at which KS was to be placed was in fact capable of providing an appropriate education following the IEP.

*Id.* at 9–10. He also found the Rebecca School would "meet[] the unique education needs of KS," that the Parents "cooperated with the school district," and that therefore "the parents here should be reimbursed for their costs in funding KS's attendance at the Rebecca School" of $97,700. *Id.* at 10–11.

**D. The State Review Officer's Decision**

On April 10, 2013, the District appealed the IHO's decision to the Office of State Review and, on March 5, 2015, SRO Carol H. Hauge released a thirty-four page opinion that overturned the IHO and found that K.S. was not denied a FAPE. She concluded that the IEP was procedurally and substantively adequate, and the Parents did not raise a non-speculative challenge to the DOE's choice of Placement School. *See* SRO Op. at 33–34.

In so doing, the SRO considered the Parents' arguments and explained why each alleged shortcoming did not amount to a denial of FAPE—either individually or when combined. Specifically, she found: (i) that the CSE possessed sufficient information to create the IEP, *see* SRO Op. at 9–15; (ii) that, while the IEP's present level of performance section did not conform to state regulations, its goals section "contained sufficient information to provide the student with

educational benefits," *id.* at 15–19; (iii) that there was nothing improper about basing the IEP's annual and short term goals on the Progress Report and that inclusion of methodologically specific "jargon" in the goals did not necessitate that the placement school implement the IEP using any particular teaching methodology, *id.* at 20–23; (iv) that the failure to timely perform mandatory behavior evaluations did not deny the child a FAPE, *id.* at 23–27; (v) that the recommended 6:1:1 class size and 1:1 paraprofessional were appropriate for K.S., *see id.* at 27–29; (vi) that the failure to provide for parental counseling did not deny K.S. a FAPE, *see id.* at 29–30; (vii) that the CSE appropriately declined to recommend a teaching methodology because "the hearing record does not contain sufficient evidence upon which to conclude that the student could only make progress" with any one methodology, *id.* at 31; and (viii) that the Parents' challenges to the Placement School were speculative, *see id.* at 31–33.

**II. Procedural History**

On July 2, 2105, the Parents filed suit in this Court alleging that the SRO erred in reversing the decision of the IHO. The parties made cross motions for summary judgment based on the administrative record thereafter.

**STANDARD OF REVIEW**

"Summary judgment in [the IDEA] context involves more than looking into disputed issues of fact; rather, it a 'pragmatic procedural mechanism' for reviewing administrative decisions." *L.O.* 822 F.3d at 108 (quoting *R.E.*, 694 F.3d at 184). "In considering an IDEA claim, a district court 'must engage in an independent review of the administrative record and make a determination based on the preponderance of the evidence.'" *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 837–38 (2d Cir. 2014) (quoting *Gagliardo*, 489 F.3d at 112). However, "[t]he role of the federal courts in reviewing state educational decisions under the IDEA is

circumscribed." *Gagliardo*, 489 F.3d at 112 (internal quotation marks and citation omitted). "[T]he Supreme Court has cautioned that such review 'is by no means an invitation of the courts to substitute their own notions of sound educational policy for those of the school authority which they review.'" *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 206 (1982)). "This review requires a more critical appraisal of the agency determination than clear-error review but falls well short of complete *de novo* review." *L.O.*, 822 F.3d at 108 (internal quotation marks omitted) (quoting *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 138 (2d Cir. 2013)).

The district court "must give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *M.O.*, 793 F.3d at 243 (quoting *A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009)). "The deference owed depends on both the quality of the opinion and the court's institutional competence." *C.F.*, 746 F.3d at 77 (citing *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 244 (2d Cir. 2012)). "[D]eterminations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures." *Id.* at 77 n.7 (quoting *M.H.*, 685 F.3d at 244). "Where the IHO and SRO disagree, [the court should] defer to the reasoned conclusions of the SRO as the final state administrative determination. However, where the SRO's determinations are insufficiently reasoned to merit deference, the courts should defer to the IHO's analysis." *Id.* at 77 (quoting *M.H.*, 685 F.3d at 246, 252) (internal citations, quotations, and alterations omitted); *see also R.E.*, 694 F.3d at 189.

## DISCUSSION

The Parents argue that, in light of procedural and substantive errors in the IEP together with an inappropriate placement, this Court should reverse the SRO and find, under the *Burlington/Carter* test, that the DOE failed to provide K.S. with a FAPE, that the Rebecca School is an appropriate placement, and that the equities favor the Parents. The DOE counters that the Court should defer to the SRO's opinion, and find that the IEP provided K.S. with a FAPE.

"In determining whether an IEP complies with the IDEA, courts make a two-part inquiry, that is, first, procedural, and second, substantive." *M.W.*, 725 F.3d at 139 (quoting *R.E.*, 694 F.3d at 189–90). For procedural violations, courts "examine[] the procedural adequacy of [an] IEP asking 'whether the state has complied with the procedures set forth in the IDEA.'" *L.O.*, 822 F.3d at 109 (quoting *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 160 (2d Cir. 2014)) (alteration in original). "Under this framework, procedural violations will entitle parents to relief only if they impeded the child's right to a FAPE, significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a FAPE to the parents' child, or caused a deprivation of educational benefits." *Id.* (internal citations and alterations omitted). "That is, parents must articulate how a procedural violation resulted in [an] IEP's substantive inadequacy or affected the decision-making process." *Id.* (quoting *M.W.*, 725 F.3d at 139). "[A] school district fulfills its substantive obligation under [the] IDEA if it provides an IEP that is likely to produce progress, not regression, and if [it] affords the student with an opportunity greater than mere trivial advancement." *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 254 (2d Cir. 2009) (quotations omitted); *see also M.O.*, 793 F.3d at 239. In other words, school districts must provide students with a program that provides a "basic floor of opportunity." *T.K. v. N.Y.C. Dep't of Educ.*, 810 F.3d 869, 875 (2d Cir. 2016).

As explained below, the SRO's determinations on the Parents' procedural and substantive challenges to the IEP and DOE's placement are well-reasoned and supported by the record. The Court thus finds that, under the first *Burlington/Carter* prong, the DOE offered K.S. a FAPE. It therefore need not reach whether the Rebecca School was an appropriate alternative, nor whether the equities favor either party.

## I. Procedural Challenges

The Court will first address the Parents' procedural challenges. They assert that K.S. was denied a FAPE because (i) the CSE considered insufficient evaluative information; (ii) the IEP's present level of performance section was inadequate; (iii) the CSE failed to timely consider K.S.'s Functional Behavior Assessment ("FBA") and Behavior Intervention Plan ("BIP"); and (iv) the IEP did not provide for parental training.[3] After examining these procedural challenges, the SRO and IHO both concluded that to the extent that procedural deficiencies occurred, they did not deny K.S. a FAPE. *See* IHO Op. at 9; SRO Op. at 33. The Court agrees.

### A. Insufficient Evaluative Information

In conducting an evaluation under IDEA, the CSE is required to "review existing evaluation data on the child, including . . . evaluations and information provided by the parents of the child; . . . current classroom-based, local, or State assessments, and classroom-based observations; and . . . observations by teachers and related services providers." 20 U.S.C. § 1414(c)(1). The CSE is further obliged to "identify what additional data, if any, are needed to determine . . . the present levels of academic achievement and related developmental needs of the

[3] The Parents also assert in conclusory fashion that K.S. was denied a FAPE because the IEP's annual goals were "unquestionably not measurable," Pls.' Mem. at 17. The Parents do not, however, contest the specificity and measurability of the short-term goals. The Second Circuit rejected a similar challenge in *D.A.B. v. New York City Department of Education*, 630 F. App'x 73 (2d Cir. 2015), noting that "although plaintiffs complain that the annual goals fail to identify how and when the annual goals will be met, it is clear that progress towards the annual goals reasonably would have been measured by the extent to which [a student] had achieved the short-term goals. This is consistent with the requirement for three progress reports during the year on each annual goal." *Id.* at 77.

child . . . [and] whether any additions or modifications to the special education and related services are needed to enable the child to meet the measurable annual goals set out in the individualized education program of the child." *Id.*

There is considerable evidence in the record supporting the SRO's conclusion that the CSE complied with these statutory requirements. In creating K.S.'s IEP, the CSE considered the Psychoeducational Evaluation, the Progress Report, and the Classroom Observation. *See* SRO Op. at 10. The SRO further observed that "[i]n addition to the foregoing, [Dr. Czarnecki] testified that the CSE also considered information provided to the CSE by the student's then-current teacher at the Rebecca School . . . and [a] Rebecca School social worker because they presented 'current and accurate descriptors of [K.S.'s] performance.'" *Id.* The Second Circuit has held that a CSE's review of similar evaluative information was sufficient. In *R.B. v. New York City Department of Education*, 589 F. App'x 572 (2d Cir. 2014), for example, the court "defer[red] to the SRO, which found that the documents the IEP team reviewed—including [the most recent] evaluation of [the student] from the Rebecca School, [the student's prior] IEP, and a . . . classroom observation of [the student] conducted by the DOE—constituted sufficient evaluative data with which to formulate [the IEP]." *Id.* at 575. Here, the SRO similarly determined that a Rebecca School Progress Report and Classroom Observation when considered in conjunction with the Psychoeducational Evaluation (which was not available in *R.B.*) constituted "sufficient evaluative information upon which to develop the student's 2012-13 IEP." SRO Op. at 15. The Court thus defers to the SRO's well-reasoned conclusion.

The Parents nonetheless argue that, for a number of reasons, the information before the CSE was insufficient. First, the Parents assert that the Psychoeducational Evaluation was inadequate because it "failed to pinpoint K.S.'s academic functioning to a range of less than three

years." Pls.' Mem. at 11. That document indicates that K.S. was operating at a pre-kindergarten level in most areas, but above the second grade level in "Letter-Word Recognition." Psychoeducational Evaluation at 4. The Parents do not dispute that K.S. is more advanced in letter-word recognition, but claim that the mere failure to identify a single grade level for K.S.—as opposed different grade levels for different areas of academic performance—taints the evaluation itself. Without additional information explaining how the evaluator's determination constitutes error, the Court concludes that the Psychoeducational Evaluation was sufficiently specific.

Second, they assert that the IEP's "lack[ of] any specificity in describing K.S.'s sensory needs [was] presumably a result of the lack of an evaluation to assess and determine these needs." Pls.' Mem. At 11. This supposition is belied by the record. The Progress Report described K.S.'s "mixed sensory system" at length. Progress Report at 11. It reflects, in a section on her progress in OT, that K.S. "is hyper-responsive in the integration of visual, auditory, and tactile input, and also becomes dysregulated evidenced by crying and retreating to the corner of the room if her environment is too loud. She is especially dysregulated by her peers crying . . . is hypo-responsive in the integration of vestibular and proprioceptive input, and seeks intense rotary input and likes to jump on the trampoline." *Id.* "Since September," it reports, "[K.S.] demonstrates better tolerance for multisensory input, and with this growth has come enhanced emotional regulation." *Id.* The Court thus finds the CSE had access to sufficient information to evaluate and assess K.S.'s sensory needs.

Finally, the Parents assert that "Czarnecki was unaware of when the last OT evaluation was conducted." Pls.' Mem. at 11. The Parents do not, however, argue that the CSE did not have before it recent information on K.S.'s progress in OT, nor could they. As the SRO found, "given the amount of information about the student's related services needs in the December 2011

Rebecca School [P]rogress [R]eport—and in particular, speech-language therapy and OT—even if the May 2012 CSE's failure to conduct updated evaluations of the student in these two areas constituted a procedural violation, the evidence in the hearing record did not provide any basis upon which to conclude that this procedural violation resulted in a failure to offer the student a FAPE for the 2012-13 school year." SRO Op. at 14. The Court defers to the SRO's conclusion, as the record reflects that the CSE reviewed detailed descriptions of K.S.'s OT progress in the Progress Report.

**B. Inadequate Present Performance Section of IEP**

The Parents next argue that inadequacies in the IEP's "Present Level of Performance and Individual Needs" section ("PLP") amounted to denial of a FAPE. They assert that the SRO agreed "that the present levels of performance provide very limited descriptions of the student's [activities of daily living ('ADL')] skills, intellectual functioning, and expected rate of progress, and the present levels of performance did not establish a 'baseline' for the annual goals in the IEP" as required by New York state guidance. SRO Op. at 18–19. Even accepting, however, as the SRO did, that the inadequacies in the IEP's PLP constituted a procedural violation, the Court concurs with the SRO that the violation did not deny K.S. access to a FAPE because it neither (1) altered the development of the IEP; nor (2) would affect its future implementation.

First, it did not alter the development of the IEP because, while the CSE may not have adequately memorialized its findings, it nonetheless carefully considered K.S.'s present level of academic performance when developing the IEP. The SRO found "evidence of what appeared to be a thorough discussion of the student's needs at the May 2012 CSE." SRO Op. at 18. For example, Dr. Czarnecki testified that the CSE conferred with Ms. Gothrati, K.S.'s then-current Rebecca School teacher, about "whether or not she felt that at the time [the Progress Report] was

still an accurate reflection of [K.S.]'s functioning, and she had reported to [the CSE] that yes, she did feel that it was an accurate reflection." Aug. 8 Tr. 138–39. The CSE also "review[ed] the specific goals that were written in the [Progress R]eport and talk[ed] about asking the teacher[s] . . . their estimation of whether or not they felt that the goal was appropriate, if [K.S.] was still working on the goal, if she had met it, . . . [or] if the feeling was that she would meet it in the near future." Aug. 8 Tr. 140–41. The CSE Minutes further reflect that the CSE discussed K.S.'s academic strengths and weaknesses, causes of her dysregulation, challenges in communications with others, and lack of sense of safety. CSE Minutes at 1–3. Based on this evidence, the Court will defer to the SRO's determination that the CSE adequately and accurately identified and considered K.S.'s present level of performance, even if it did not properly memorialize its findings in accordance with state guidance.

The Parents do not appear to contest that the CSE was able to accurately determine K.S.'s level of performance; instead they argue only that K.S. was denied FAPE because "none of these discussions were transposed to the IEP" and "it is the IEP that is the centerpiece of the IDEA's education delivery system." Pls.' Mem. at 13 (internal citation and quotation marks omitted). The IEP did, however, accurately note that K.S. "has very limited skills in academics as well as daily living and socialization[,] . . . has very short attention span with hyperactivity and constant echolalia and perseveration[,] . . . has very limited self-awareness and ability to interact with others[,] . . . [and] is currently functioning below the kindergarten level in all areas except reading decoding." May IEP at 1. And, to the extent that some of K.S.'s present levels of performance were not memorialized in the IEP, this Court cannot find that such an omission denied K.S. a FAPE in light of the fulsome discussion of her capacities during the CSE. To do so would "exalt form over substance." *M.H. v. N.Y.C. Dep't of Educ.*, No. 10-CV-1042 (RJH), 2011 WL 609880,

at *11 (S.D.N.Y. Feb. 16, 2011) ("[I]t would exalt form over substance to hold that the IEP was inappropriate simply because a recommendation, omitted from the IEP because of a clerical error—but which appeared in the CSE meeting minutes, and was reflected in the conduct of the parties—failed to appear within the four corners of the IEP." (internal citation and quotation marks omitted)).

The Parents also argue that the procedural inadequacies of the PLP in the IEP denied K.S. a FAPE because her teachers would "have an inaccurate understanding of her baseline functioning" due to the inadequacies of the PLP. *See* Pls.' Reply Mem. at 3. The SRO rejected this argument, finding that "the annual goals and short-term objectives include more specific information about the student's present levels of performance and sufficiently describe the student's baseline skills in order to guide instruction." SRO Op. at 19.

Whether or not K.S.'s present level of performance is discernable from the goals, the Court agrees that the specificity of the goals ensures that the PLP procedural violation did not deny K.S. a FAPE. In this regard, *P.G. v. New York City Department of Education*, 959 F. Supp. 2d 499 (S.D.N.Y. 2013) is instructive. In *P.G.*, the court considered a similar contention that an IEP "was inadequate because it did not accurately describe [the child's] then-present levels of performance and needs." *Id.* at 511. That court rejected the argument, reasoning that

> the IEP, though not specifically identifying certain of J.G.'s issues, detailed a program that was designed to address precisely those issues. This Court agrees with the analysis of the SRO, and defers to the SRO's educational expertise on this matter. In short, the [c]ourt sees no legal reason why the IEP's failure to specifically state J.G.'s "anxiety" or his ability to "self-monitor attention, and follow multi-step directions" renders the IEP substantively unreasonable in light of the measures outlined in the IEP that the SRO held were specifically designed to address those issues.

*Id.* at 512. Here, as noted by the SRO, the IEP contained not only academic goals, but also "included annual goals that targeted the student's ADL skills, including feeding skills, safety awareness[,] . . . quality of movement, and efficient organization of self for effective participation in school and home activities." SRO Op. at 19. As also described by the SRO, these goals were detailed and measurable, *see id.*, requiring, for example, that K.S. will "follow novel 1-step directives across multiple communicative environments in 8 out of 10 opportunities," IEP at 7. It is this specificity and measurability that would have allowed teachers to facilitate the child's efforts to meet these goals, even if the PLP was lacking. This Court thus finds that, like in *P.G.*, because the CSE accurately determined K.S.'s present level of performance and developed specific goals to enable K.S. to advance beyond those present levels, she was not denied a FAPE.

To the extent the Parents assert that the PLP is not merely inadequate but also misleading to a teacher, *see* Pls.' Mem. at 14–15, the argument is not supported by the record. The SRO took issue only with the detail in the PLP but not its accuracy. *See* SRO Op. at 19. It found, and this Court agrees, that "the information in the present levels of performance and individual needs section of the May 2012 IEP is accurate." SRO Op. at 19. The Parents' argument that the PLP is inaccurate because it states that K.S.'s "current function is below the kindergarten level in all areas except reading decoding" in one section of the IEP, but in a later section lists "kindergarten" as K.S.'s level for math and reading skills does not convince the Court otherwise. *Compare* IEP at 1 *with* IEP at 14. The Court agrees with the SRO that this would not prevent the proper implementation of the IEP. *See D.B. v. N.Y.C. Dep't of Educ.*, 966 F. Supp. 2d 315, 332 (S.D.N.Y. 2013) (deferring to an "SRO Decision reason[ing] that any difference in characterizing the Student at a pre-K or kindergarten level on the Student's IEP would not affect the IEP's utility in properly guiding appropriate instruction for the Student and did not deny the Student a FAPE").

The Court thus defers to the SRO's ultimate conclusion that "based upon a review of the evidence and upon review of the entire May 2012 IEP, the hearing record does not otherwise indicate that the limited information in the present levels of performance in the May 2012 IEP altered the overall accuracy of the IEP which—when read as a whole—contained sufficient information to provide the student with educational benefits." SRO Op. at 19.

**C. FBA and BIP**

The Parents also argue K.S. was denied a FAPE because the Functional Behavior Assessment ("FBA") and Behavior Intervention Plan ("BIP") were substantively inadequate and were not prepared until after the CSE developed the IEP. The SRO did not dispute these facts but nonetheless concluded that K.S. was not denied a FAPE. *See* SRO Op. at 26. The Court will defer to her reasoning.

The IDEA requires a school district to "consider the use of positive behavioral interventions and supports, and other strategies" to address behavior by a disabled child that "impedes the child's learning or that of others." 20 U.S.C. § 1414(d)(3)(B)(i). "New York state regulations go beyond this floor set by the IDEA; they require a school district to conduct a full FBA for a student who exhibits behavior that impedes learning, and to develop a BIP to address that behavior." *T.M.*, 752 F.3d at 169. The Second Circuit, however, has held that, although the failure to conduct an adequate FBA is a "serious procedural violation," it "does not rise to the level of a denial of a FAPE if the IEP adequately identifies the problem behavior and prescribes ways to manage it." *R.E.*, 694 F.3d at 190. "[W]hether an IEP adequately addresses a disabled student's behaviors and whether strategies for dealing with those behaviors are appropriate are 'precisely the type of issue[s] upon which the IDEA requires deference to the expertise of the administrative officers.'" *M.W.*, 725 F.3d at 140 (quoting *A.C.*, 553 F.3d at 172).

Here, the SRO concluded that K.S. was not denied a FAPE because "notwithstanding the deficiencies in the FBA and BIP, the May 2012 IEP otherwise addressed the student's behavioral and sensory needs." SRO Op. at 26. In particular, the SRO explained that the IEP "included an annual goal to improve the student's sensory processing with short-term objectives that included the provision of proprioceptive and vestibular input, as well as movement breaks to improve the student's ability to self-regulate," "addressed increasing the student's ability to maintain sensory regulation with an annual goal and short-term objective that addressed the student's ability to request and utilize self-regulation strategies," and "provided the student with both individual and small group OT services to address the student's sensory regulation needs, as well as the services of a full-time, 1:1 crisis management paraprofessional." *Id.* at 26–27.

The SRO's conclusion is consistent with Second Circuit law. In similar circumstances, the circuit has "concluded that an FBA omission did not deny a FAPE where (1) the CSE reviewed documents regarding the student's behavior, and (2) the IEP provided strategies to address those behaviors, 'including the use of a 1:1 aide to help him focus.'" *M.W.*, 725 F.3d at 140 (quoting *R.E.*, 694 F.3d at 193). So too here, the SRO found that the CSE examined K.S.'s behavior and addressed it through the use of, among other things, a 1:1 aide. *See* SRO Op. at 26–27. That decision is entitled to deference. *See R.E.*, 694 F.3d at 193 (noting that the SRO's reliance on "specific strategies to address [the student's] behaviors, including the use of a 1:1 aide to help him focus . . . is entitled to deference").

Because "a review of the evidence in the hearing record supports a determination that, when read in conjunction, the FBA, BIP and IEP adequately addressed the student's behavioral needs," SRO Op. at 23, K.S. was not denied a FAPE.

**D. Parental Training**

The Parents next contend that the IEP fails to provide for parental counseling and training. Pls.' Mem. at 26. They are correct that New York law mandates counseling for parents of students with autism, such that "failing to include provisions for parent counseling and training [is] a clear procedural error in the IEP." *N.S. v. N.Y.C. Dep't of Educ.*, No. 13-CV-7819 (VEC), 2014 WL 2722967, at *9 (S.D.N.Y. June 16, 2014); *see also* NYCRR tit. 8, § 200.13(d). The SRO nevertheless found that the violation did not constitute denial of FAPE, *see* SRO Op. at 30, and courts routinely agree, *see, e.g.*, *M.W.*, 725 F.3d at 142; *R.E.*, 694 F.3d at 195. As the Second Circuit recently stated, "because school districts are required . . . to provide parent counseling, they remain accountable for their failure to do so no matter the contents of the IEP,' so this omission, although a procedural violation, did not deny the student a free appropriate public education." *R.B. ex rel. D.B. v. N.Y.C. Dep't of Educ.*, 603 F. App'x 36, 39 (2d Cir. 2015) (quoting *R.E.*, 694 F.3d at 191). In this case, the failure to provide counseling neither resulted in the denial of a FAPE nor interfered with K.S.'s ability to participate in the decision-making process.

**E. Cumulative Effect**

The Second Circuit has "held that '[m]ultiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not.'" *L.O.*, 822 F.3d at 123 (quoting *R.E.*, 694 F.3d at 190). But even multiple violations will not amount to denial of a FAPE where "the procedural deficiencies were formalities and the record shows that the Parents were afforded a full opportunity to participate in the IEP process." *R.B. v. New York City Dep't of Educ.*, No. 15-CV-6331 (DLC), 2016 WL 2939167, at *9 (S.D.N.Y. May 19, 2016). Though the IEP contained some procedural errors, the Court will defer to the conclusions of the

IHO and SRO, who agreed that these errors neither individually, nor cumulatively, denied K.S. a FAPE. *See J.C. v. N.Y.C. Dep't of Educ.*, 643 F. App'x 31, 33 (2d Cir. 2016).

## II. Substantive Challenges

The Parents also make several substantive challenges to the IEP. They argue that (i) the IEP's goals were deficient because K.S. had already met or surpassed the goals set in the IEP by the end of the 2011–2012 schoolyear; (ii) the IEP, in light of its language, should have recommended a particular teaching methodology; (iii) the IEP should have required music therapy; (iv) the recommended 1:1 paraprofessional was overly restrictive; and (v) the recommendation of physical therapy was in error.

### A. Goals Already Achieved

The Parents first argue that the goals were inappropriate because "the District was aware [that] over half of the educational short term educational goals [*sic*] were going to be mastered by the end of the 2011–2012 school year, inevitably rendering those goals inappropriate for the 2012–2013 school year." Pls.' Mem. at 17. The Parents, however, point to only one ADL goal regarding safety awareness, which the SRO "acknowledged . . . had been mastered at the time of the IEP meeting." Pls.' Mem. at 18 (citing SRO Op. at 20 n.10). With respect to the other goals, the SRO credited the testimony of Dr. Czarnecki, who "testified that the May 2012 CSE reviewed each of the student's then-current annual goals . . . one-by-one" and ultimately included in the IEP only those "annual goals [that] remained appropriate for the student" after consultation with the Rebecca School teacher. SRO Op. at 20.

Moreover, K.S. was not denied a FAPE because the safety awareness goal was mastered prior to the CSE. In *J.M. v. New York City Department of Education*, No. 12-CV-8504 (KPF), 2013 WL 5951436 (S.D.N.Y. Nov. 7, 2013), the SRO found that ten IEP goals had been completed

before the start of the school year. *Id.* at *19. The court nonetheless agreed with the SRO that the student was not denied a FAPE because the goals were created as a result of "collaborative discussions among the CSE members [including Rebecca School teachers], as to what the materials [including a Rebecca School progress report] indicated and what the members [of the CSE] anticipated would be appropriate goals for [the student] throughout the upcoming school year." *Id.* Here, the existence of a single previously achieved goal similarly did not deny K.S. a FAPE because, like in *J.M.*, the SRO found that the District developed K.S.'s goals in conjunction with the Rebecca School staff "regarding whether the student met the annual goal, whether the annual goal needed to be continued and addressed going forward, or whether the annual goal should be modified." SRO Op. at 20. Because "[t]he sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers," *L.O.*, 822 F.3d at 118, the Court will defer to the SRO.

To the extent the Parents are arguing that the IEP's goals were deficient because they were based on the Progress Report, which contained goals that were *designed* to be achieved prior to the start of the next school year, it too is unavailing. Courts in this district have routinely rejected similar arguments about Rebecca School progress reports because "there was no authority for the proposition that drawing goals from a teacher's progress report is a violation of the [applicable law] or regulations." *R.B. v. N.Y.C. Dep't of Educ.*, No. 12-CV-3763 (AJN), 2013 WL 5438605, at *13 (S.D.N.Y. Sept. 27, 2013), *aff'd,* 589 F. App'x 572 (2d Cir. 2014) (internal quotation marks omitted); *accord A.M. ex rel. Y.N. v. N.Y.C. Dep't of Educ.*, 964 F. Supp. 2d 270, 285 (S.D.N.Y. 2013); *C.L.K. v. Arlington Sch. Dist.*, No. 12-CV-7834 (NSR), 2013 WL 6818376, at *13 (S.D.N.Y. Dec. 23, 2013); *J.M.*, 2013 WL 5951436, at *19.[4]

[4] Plaintiff's citation to *E.H. v. New York City Department of Education*, No. 15-CV-3535 (RWS), 2016 WL 631338, at *12 (S.D.N.Y. Feb. 16, 2016), does not persuade the Court otherwise. In that case, the court found there

**B. Teaching Methodology**

Next, the Parents argue that the IEP was flawed because it failed to recommend the "Developmental Individual-difference Relationship" ("DIR") teaching methodology to implement K.S.'s goals, despite the IEP's inclusion of DIR specific terminology such as "circles of communication." Pls.' Mem. at 18.[5] The SRO concluded that the inclusion of DIR terms did not necessitate use of the DIR methodology. *See* SRO Op. at 22. The Court agrees.

Numerous courts have rejected this very argument regarding the inclusion of DIR terms in an IEP's goals. *See, e.g.*, *A.D. v. N.Y.C. Dep't of Educ.*, No. 12-CV-2673 (RA), 2013 WL 1155570, at *12 (S.D.N.Y. Mar. 19, 2013). In *T.C. v. New York City Department of Education*, No. 15-CV-3477 (VEC), 2016 WL 1261137 (S.D.N.Y. Mar. 30, 2016), for example, the court was not persuaded by the testimony of the same Rebecca School Director who testified here, Tina McCourt, that the IEP could only be implemented using DIR. *See id.* at *14. It reasoned that "[a]lthough the goals are generally methodologically neutral, the IEP, at times, slips into DIR jargon, using the term 'circle of communication,' for example. With all due respect to the proponents of DIR, one does not have to have been trained in DIR to understand what a 'circle of communication' is." *Id.* at *16 n.21. Here too, the SRO was unconvinced that a particular teaching methodology was necessary because terms like "circles of communication" have "relatively common meaning" that would not "prevent a teacher or therapist from implementing the [IEP's] goals." SRO Op. at 22. The Court finds this reasoning persuasive, especially given that

---

was no effort by the CSE to ensure that the goals, taken from a progress report, were current. *Id.* at *12 ("[I]t was clear the CSE failed to take into account [the student's] progress between December 2011 and June 2012, and therefore developed goals that did not meet his present levels of performance." (internal quotation marks omitted)). Here, by contrast, the SRO found that the CSE examined each goal with the Rebecca School staff to ensure the current appropriateness of each for K.S. in the coming school year. *See* SRO Op. at 20.

[5] The Parents define DIR as "a research based developmental model that focuses on the functional emotional development of students with core neurodevelopmental delays in relating and communicating." Pls.' Mem. at 18.

"'[d]ecisions involving a dispute over an appropriate educational methodology' . . . are subject to considerable deference." *N.S.*, 2014 WL 2722967, at *6 (quoting *C.F.*, 746 F.3d at 77 n.7).

**C. Music Therapy**

The Parents also make several arguments about music therapy. They maintain that the SRO erred in overruling the IHO's determination that the CSE denied K.S. a FAPE when it substituted counseling—specifically, "play" and "talk" therapy—for the music therapy that she received at the Rebecca School. They argue that, given the testimony that K.S. "would not benefit from talk therapy or play therapy, but rather, she required music therapy," the CSE should have recommended music therapy as a methodology or a related service. Pls.' Mem. 19–20, 27–29. The DOE urges the Court to follow "the SRO's well-reasoned determination [that] is supported by the record." Def.'s Reply at 6.

Because the SRO's decision on the appropriateness of the IEP's methodology and services is indeed well reasoned, this Court will defer to her expertise in concluding that the lack of music therapy in the IEP did not deny K.S. a FAPE. While the IHO found that "music is not simply a nice feature but is required to have an appropriate program for KS," the SRO disagreed. She considered the IHO's opinion and nonetheless found, after reviewing the record in detail, that

> based on the information available to the May 2012 CSE, the student demonstrated skills that would have allowed her to participate in other forms of counseling, such as talk or play therapy, and the May 2012 CSE did not err in substituting the annual goals related to music therapy for the annual goals related to counseling. . . . Here, while it appears that the student benefited from . . . mental health services in the form of music therapy, the hearing record does not contain sufficient evidence upon which to conclude that the student could only make progress in such an environment.

SRO Op. at 23, 31.

This conclusion is supported by the record, and is consistent with the Second Circuit's instruction that "because of their specialized knowledge and experience, state administrators are generally superior to federal courts at resolving 'dispute[s] over an appropriate educational methodology'" where, as here, such "administrators weigh the evidence about proper teaching methodologies and explain their conclusions." *E.H. v. N.Y.C. Dep't of Educ.*, 611 F. App'x 728, 731 (2d Cir. 2015) (quoting *M.H.*, 685 F.3d at 244); *see also Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 450 (2d Cir. 2015), *cert. denied,* 136 S. Ct. 2022 (2016), *reh'g denied,* 136 S. Ct. 2546 (2016) ("[The] IEP need not 'furnish every special service necessary to maximize each handicapped child's potential,' it must be 'likely to produce progress' that is more than 'trivial advancement.' On this question, substantial deference is owed to the judgments of state administrative officers." (quoting *Cerra*, 427 F.3d at 194)). According to the Rebecca School Progress Report, K.S. "primarily communicates through the use of verbal language," she could participate in "two-way purposeful emotional interactions," she "shared social problem solving," she engaged in "pretend play . . . to act out some of the familiar fairy tales read in class," and she has "an understanding of emotions in herself and others." Progress Report at 1, 2, 5. According to Dr. Czarnecki, the CSE relied on this evidence in concluding that general counseling was appropriate to allow K.S. to address her "needs in terms of developing her interpersonal social emotional skills." Nov. 8 Tr. 159.

The record also reflects that the CSE did not merely dismiss the importance of music but attempted to incorporate it as suggested by the Parents and K.S.'s teacher at the CSE. A.S., K.S.'s parent, testified that "[w]hen we talked the music over with the [CSE,] Laura [Gufarotti, K.S.'s Rebecca School teacher,] made it really, really clear that [K.S.] needs . . . to have music as part of her—as part of the way to reach her. And Dr. [Czarnecki] said, okay, so you think that music

should be integrated throughout [K.S.'s] school day and heavily involved in her program, and Laura said, yes, absolutely, she needs it." Nov. 19 Tr. 522. Ultimately, while it did not require music therapy as a methodology or service, the IEP did exactly as the Rebecca School teacher suggested and incorporated references to music throughout the IEP, including that "[music] should be integrated throughout the school day for [K.S.]," that she "really enjoys sounds," that "[m]usic engages her across a variety of environments," and that "it helps to regulate [K.S.] and helps her to express herself." May IEP at 1.

The Parents nevertheless argue that music therapy was indispensable to K.S.'s progress, citing to instances during the impartial hearing where Rebecca School personnel testified about K.S.'s need for music therapy. *See* Pls.' Mem. at 20–21 (quoting extensively from the testimony of McCourt and Taketa). The SRO considered that testimony but ultimately concluded that the lack of music therapy did not render the IEP substantively inadequate. Although courts "routinely consider the testimony of witnesses who did not attend CSE meetings when determining the adequacy of an IEP," the Second Circuit has deferred to an SRO's decision where it "explicitly considered the testimony . . . but put more weight on the [the District's] witnesses." *J.S. v. N.Y.C. Dep't of Educ.*, No. 15-1827-CV, 2016 WL 2342490, at *3 (2d Cir. May 4, 2016). Because here, "[t]he SRO's decision addressed all of the arguments presented at the independent hearing and grappled with conflicting evidence," this Court finds "that the SRO's decision was 'reasoned and supported by the record,' and [will] defer to its findings that [the District] provided [K.S.] with a FAPE." *Id.* (quoting *Gagliardo*, 489 F.3d at 114).

As another judge on this court stated when faced with a similar challenge, "[a]lthough [the Student]'s parents might prefer [she] have music therapy, '[t]he IDEA guarantees only that students with disabilities are provided an appropriate education, not one that provides everything

that might be thought desirable by loving parents.'" *N.K. v. New York City Dep't of Educ.*, 961 F. Supp. 2d 577, 592–93 (S.D.N.Y. 2013) (quoting *Bryant v. N.Y. State Educ. Dep't*, 692 F.3d 202, 215 (2d Cir. 2012)).

**D. 1:1 Paraprofessional**

The Parents next take issue with the SRO's conclusion that the IEP's recommendation of a 1:1 paraprofessional was appropriate for K.S. They argue that the recommendation of a 1:1 paraprofessional denied K.S. a FAPE because "K.S. simply did not require an aide" and thus the assignment would be "overly restrictive." Pls.' Mem. at 23–24. The SRO concluded, over the Parents' objection, that the CSE's recommendation was supported by the evidence, noting that—as reflected in the IEP—a paraprofessional was appropriate because K.S. "'required very close classroom management'" and "because she exhibited 'very poor self-preservation and safety skills.'" SRO Op. at 27–28 (quoting May IEP at 2).

The Second Circuit addressed an identical argument in *R.B. ex rel. D.B. v. New York City Department of Education*, 603 F. App'x 36 (2d Cir. 2015), in which the parents attempted to "attack this placement [with a 1:1 paraprofessional]. . . not as insufficiently supportive but as *too* supportive, a crutch that vitiates their son's right to be educated in the least restrictive environment." *Id.* at 40 (emphasis in original). The court rejected the parents' contention, reasoning,

> The requirement that students be educated in the least restrictive environment applies to the type of classroom setting, not the level of additional support a student receives within a placement . . . . Here, the parents agreed with their son's recommended placement in a special class within a special school, and the additional support provided by the 1:1 paraprofessional did not deny their son the least restrictive environment.

*Id.* As nothing distinguishes this case from *R.B.*, the Court will defer to the SRO.

**E. Physical Therapy**

Next, the Parents assert that the CSE's decision to recommend PT, without setting any PT related goals, constituted a denial of a FAPE because the District knew that K.S. did not need PT and "K.S.'s instruction would have been reduced by one hour weekly to accommodate this inappropriate service." Pls.' Mem. at 25–26. The Parents cite no law to support their argument. The DOE argues that the Court should defer to the SRO, who "determined that 'the May 2012 CSE continued to recommend[] PT services for the student because PT has previously been recommended for the student and the May 2012 CSE did not have information before it upon which to discontinue PT services.'" Def.'s Mem. at 25 (quoting SRO Op. at 14–15). This Court agrees that the CSE's decision to require PT is supported in the record, *see* Nov. 8 Tr. 193–195, and that, in any event, K.S.'s attendance at PT for one hour per week would not have prevented her from receiving the "basic floor of opportunity" that the DOE must provide. *T.K.*, 810 F.3d at 875.

With respect to the lack of PT goals, in *L.O.*, the Second Circuit rejected a similar claim about the adequacy of an IEP that required PT, but did not include any related goals. 822 F.3d at 122. It found that "[a]lthough the IEP was wanting of any goals related to [the student's] physical therapy needs, because he continued to receive weekly and individual physical therapy related services under the terms of the IEP . . . [he] was not deprived of a FAPE as a result of these procedural errors." *Id.* Because the CSE's decision to assign PT is supported by the record, the Court will not disturb the SRO's conclusion that there was no denial of FAPE irrespective of the absence of any PT goals.

## III. Placement

Lastly, the Parents challenge the appropriateness of the Placement School. They argue that the Placement School could not implement the IEP as written and that the School was unable to teach the DIR methodology. Both arguments fail under Second Circuit precedent.

### A. Implementation of the IEP

In *M.O. v. New York City Department of Education*, the Second Circuit clarified that its precedent "permit[ed] challenges to a proposed placement school when based on more than speculation." *B.P. v. N.Y.C. Dep't of Educ.*, 634 F. App'x 845, 847 (2d Cir. 2015) (describing *M.O.*, 793 F.3d at 244). Since *M.O.*, the Second Circuit has distinguished between cognizable challenges to the school's "ability," "capacity," or "capability" to implement the IEP, in contrast to mere "'[s]peculation that the school district [would] not [have] adequately adhere[d] to the IEP'" despite its ability to do so. *J.C.*, 643 F. App'x at 33 (rejecting a challenge where "[t]he school possessed the capacity to" adhere to the IEP); *Y.F., individually & on behalf of K.H., a minor, v. N.Y.C. Dep't of Educ.*, No. 15-2797-CV, 2016 WL 4470948, at *3 (2d Cir. Aug. 24, 2016) (quoting *R.E.*, 694 F.3d at 195) (noting that "a non-speculative challenge" is one "to the ability of a placement school to implement the IEP"); *B.P.*, 634 F. App'x at 849 ("[T]he designated school was an appropriate placement given [the student's] needs and the school's capabilities."). Only where parents offer "non-speculative objections to a proposed school" does "'the school district . . . ha[ve] the burden to produce evidence demonstrating the placement's adequacy in response to these arguments.'" *N.M. v. N.Y.C. Dep't of Educ.*, No. 15-CV-1781 (JMF), 2016 WL 796857, at *1 (S.D.N.Y. Feb. 24, 2016), *appeal withdrawn* (June 16, 2016) (quoting *M.O.*, 793 F.3d at 245).[6]

[6] While the parties dispute who bears the burden of demonstrating the appropriateness of a placement, the Second Circuit recently clarified that "[i]t is true that we held in *M.O.* . . . that a non-speculative challenge to the ability of a placement school to implement the IEP can 'trigger a duty on the part of the school district to provide evidence regarding [the placement school's] adequacy.' But no such duty attaches if the challenge is speculative."

Under the *M.O.* standard, the Parents' placement challenges are speculative. They assert that the Placement School was inappropriate because it (i) "is unable to fulfill the related service mandates of the IEP," (ii) "could not meet K.S.'s sensory needs," and (iii) would not comply with functional grouping requirements. Pls. Mem. 32–33. Although the Parents attempt to frame their challenge as based on the Placement School's capacity to comply with the IEP, the substance of the Parents' argument is that the school is unlikely to abide by the IEP. These are precisely the types of speculative arguments rejected in *M.O.* *See N.M.*, 2016 WL 796857, at *8 ("[A] claim based on what a school 'would not have' done—as opposed to a claim based on what the school *could not do*—is speculative and barred under *R.E.* and *M.O.*").

The Parents first argue that they "were informed that related services, particularly speech and language therapy, would be pushed into the classroom," and note that "during the 2011–2012 school year, over 50% of students recommended for OT were not receiving it." Pls. Mem. 33. But neither Mr. Ross's statements nor the statistics about the school's past performance entitle K.S. to an alternative placement. A.S.'s testimony about Ms. Ross's statements are insufficient because a parent's "own testimony that [school] officials made comments to her indicating an inability to effectively serve [the student] do not come close to proving that the school was 'factually incapable' of implementing the IEP, and [could] thus [be] properly excluded from consideration." *J.D. on behalf of A.P. v. N.Y.C. Dep't of Educ.*, No. 14-CV-9424 (ER), 2015 WL 7288647, at *16 (S.D.N.Y. Nov. 17, 2015) (quoting *K.C. ex rel. C.R. v. N.Y.C. Dep't of Educ.*, No. 14-CV-836 (RJS), 2015 WL 1808602, at *12 (S.D.N.Y. Apr. 9, 2015)); *see also E.B. v. New York City Dep't of Educ.*, No. 15-CV-4998 (KBF), 2016 WL 3826284, at *9 (S.D.N.Y. July 12, 2016) ("Because plaintiff's claims are based on her one-time observations and subjective conclusions, they are not

---

*Y.F.*, 2016 WL 4470948, at *3 (quoting *M.O.* 793 F.3d at 245). As the Parents raise no non-speculative challenges to the placement decision, the DOE bears no burden to produce evidence.

sufficient to overcome the presumption that the proposed placement was capable of implementing the IEP."). The parents' citation to statistics about the school's past performance is also insufficient. In *R.E.*, for example, the Second Circuit held that a claim that a student's IEP "would not have been effectively implemented . . . because defendant's own internal documents show that a large percentage of students at [the school] had been and continue to be underserved for related services," is speculative and "not an appropriate basis for unilateral placement." *R.E.*, 694 F.3d at 195. The same is true here.

Regarding sensory equipment, the Parents argue that the school will be unable to follow the IEP's call for "sensory support to be engaged in academic tasks" because "the uncontested testimony is that the placement does not offer *any* sensory supports within the classroom, limited sensory equipment in the related services room, . . . and there is insufficient sensory equipment to address the needs of the students who are already attending the program." Pls.' Mem. at 33. Courts, however, routinely reject such arguments. *See, e.g.*, *E.P. ex rel. E.P. v. N.Y.C. Dep't of Educ.*, No. 14-CV-6032 (ARR), 2015 WL 4882523, at *7 (E.D.N.Y. Aug. 14, 2015) ("[T]he record does not show that the DOE was unwilling or unable to obtain the equipment necessary to satisfy the IEP, had E.P. actually attended public school."); *B.K. v. Dep't of Educ.*, 12 F. Supp. 3d 343, 372 (E.D.N.Y. 2014) ("Plaintiffs are unable to show that the Department was unwilling or unable to obtain any equipment necessary for G.K.'s instruction under the IEP, should he have been enrolled at [the school]."); *N.K.*, 961 F. Supp. 2d at 592 ("The fact that Plaintiffs did not observe any sensory equipment on their site visit is insufficient to demonstrate that [the school] lacked such equipment or that the school would not obtain the equipment necessary to implement J.K.'s IEP should J.K. attend the school."). The Court sees no basis to depart from this precedent.

Third, the Parents argue, based on testimony about the IEPs of the students in the prospective class, that the DOE's placement would not have complied with state requirements regarding functional grouping. *See* Pls. Mem. 34–35. The Second Circuit, however, rejected a similar argument, noting that "precedent bars us from considering such retrospective evidence." *J.C.*, 643 F. App'x at 33. The court reasoned that "grouping evidence is not the kind of non-speculative retrospective evidence that is permissible under *M.O.* The school possessed the capacity to provide an appropriate grouping for [the student], and plaintiffs' challenge is best understood as '[s]peculation that the school district [would] not [have] adequately adhere[d] to the IEP.'" *Id.* at 33 (quoting *R.E.*, 694 F.3d at 195).[7]

As the Parents point to no evidence indicating that the Placement School was unable to abide by the IEP, their challenges to the Placement fail.

### B. Use of DIR at the Placement School

Finally, the Parents argue that K.S. was denied a FAPE because the Placement School "does not provide instruction using DIR." Pls.' Mem. at 32. "[A] substantive attack on a child's IEP that is couched as a challenge to the adequacy of the proposed placement" however, "is also not a permissible challenge." *J.M. v. N.Y.C. Dep't of Educ.*, No. 15-CV-353 (VEC), 2016 WL 1092688, at *8 (S.D.N.Y. Mar. 21, 2016). In *M.O.* the Second Circuit rejected a similar argument that a placement school's "language-based program was inappropriate" because the challenge "relate[d] to the appropriateness of the IEP's substantive recommendation" which "must be determined by reference to the written IEP itself." 793 F.3d at 245. The Parents' efforts to attack

[7] To the extent the Parents contend that the school's failure to return the Parents' letter constituted a procedural failure, it did not deny K.S. a FAPE. As the court held in *E.B. v. New York City Department of Education*, No. 15-CV-4998 (KBF), 2016 WL 3826284, at *9 (S.D.N.Y. July 12, 2016), while it is "understandably frustrat[ing]" when the DOE does not respond to a parent's letters and phone calls, it does not rise to a denial of FAPE unless it denies the parent an "opportunity to participate in the decision making process." *Id.* at *9 (quoting *E.P. v. N.Y.C. Dep't of Educ.*, No. 15-CV-0606 (RA), 2016 WL 3443647, at *11 (S.D.N.Y. June 10, 2016). Here, where the Parents twice visited the Placement School, they were not denied such an opportunity.

the Placement School on the basis that it did not offer DIR—a methodology not required by the IEP—is thus foreclosed by *M.O.*[8]

**CONCLUSION**

For the reasons stated above, the Parents' challenges to the IEP and Placement fail and the Court defers to the SRO's conclusion that the DOE offered K.S. a FAPE for the 2012–2013 schoolyear. It is therefore unnecessary to reach the second and third prongs of the *Burlington/Carter* test. The DOE's motion for summary judgment is thus granted, and the Parents' motion is denied. The Clerk of Court is respectfully requested to enter judgment in favor of Defendant and close the case.

SO ORDERED.

Dated: September 19, 2016
New York, New York

Ronnie Abrams
United States District Judge

[8] The Parents' reliance on *FB v. New York City Department of Education*, 132 F. Supp. 3d 522 (S.D.N.Y. 2015) is misplaced. In that case, the court held that because the IEP implicitly "embraced a particular education methodology," the student was denied a FAPE when the school could not provide DIR. *Id.* at 551. But where, as here, a court finds that the IEP is "methodologically-neutral" and rejects the parents' assertion that the student "would only progress if taught using DIR methodology," *FB* is inapposite. *T.C.*, 2016 WL 1261137, at *14 & n.22 (rejecting an argument that the school could not implement DIR terms in an IEP).